Filed 8/7/23  In re Sebastian S. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re SEBASTIAN S. et al., Persons Coming Under the Juvenile Court Law. | B322829 |
| | (Los Angeles County Super. Ct. No. 19CCJP07386C-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. VERONICA O., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Juvenile Court Referee. Conditionally affirmed.

Katie Curtis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

——————————————————

## INTRODUCTION

Veronica O., mother of six-year-old Sebastian S. and four-year-old Gilbert Matthew S. III (Matthew),[1] appeals from the juvenile court's jurisdiction findings and disposition orders after the court sustained a petition by the Los Angeles County Department of Children and Family Services under Welfare and Institutions Code section 300, subdivision (b),[2] and removed the children. Veronica argues that substantial evidence did not support the court's finding her substance abuse put the children at substantial risk of serious physical harm or the court's removal order and that the court erred in not making a finding under section 361, subdivision (e), regarding reasonable efforts to prevent or eliminate the need for removing the children. She also argues the Department did not comply with the requirements of the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) and related California law.

---

[1]    The younger child's family members sometimes call him Matthew. We will too, to distinguish him from the children's father, Gilbert S. Jr., whom we will refer to as Gilbert.

[2]    Undesignated statutory references are to the Welfare and Institutions Code.

2

We conclude that substantial evidence supported the jurisdiction findings and removal order and that any error by the juvenile court in failing to make findings under section 361, subdivision (e), was harmless. But the Department concedes, and we agree, it did not comply with ICWA's inquiry requirements. Therefore, we conditionally affirm the juvenile court's findings and orders and direct the court to comply, and ensure the Department complies, with ICWA and related California law.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Department Investigates a Referral Concerning Veronica and Her Children*

In May 2022 the Department received a report expressing concerns for the safety of Sebastian and Matthew, who lived with Veronica. The reporter stated that Veronica spent most of her time at a ranch where her boyfriend, Jose "Pepe" Reyes, lived and worked, that Veronica took Sebastian and Matthew there with her, and that she and Pepe would lock themselves in Pepe's "shack" at the horse barn to "hav[e] sex and drugs" while the children sat outside in the dirt or wandered around the farm. The reporter said the ranch "was not a safe place" because, among other things, it was in "an area of drug sales and distribution" and the area was "full of gang members." The reporter also stated Veronica sometimes left the children at the ranch with Pepe, who would lock himself in his shack and leave the children untended.

A Department social worker and two West Covina Police Department officers visited the home of the children's paternal grandmother, Lucy S. Veronica had lived there with Sebastian

3

and Matthew since the close of a previous dependency case involving them.[3]  Lucy stated that, at the moment, the children were at school and Veronica was "down the street" with her new boyfriend, Pepe, at what the family referred to as "the ranch." Lucy said the children's father, Gilbert S. Jr. (Gilbert), lived in Oregon, where "he was on probation," but he was currently "in town" with "permission to stay a week or two."

Lucy reported that Veronica would come home late from, and "leave late in the night with the children" for, visits to the ranch.  She stated that the children said Pepe was "mean," that Sebastian reported Pepe had hit him, and that Sebastian did not like going to the ranch and would often ask to "stay home" with Lucy.  Lucy stated that Veronica was "not caring for the children," that Veronica "neglects the children's hygiene," and that Lucy often heard the children crying "they were hungry" and Veronica telling them to "'Shut up.'"  Lucy also said a family friend had told her that Veronica and Pepe used drugs together at the ranch, but Lucy could not say for certain that was true and declined to disclose the family friend's contact information because "she did not want to get the person involved."  Asked if she was concerned Veronica abused substances, Lucy answered, "I think she does, but I can't prove it."

---

[3]    In that case the juvenile court sustained a petition under section 300, subdivision (b), based on allegations, among others, Sebastian and Matthew were at substantial risk of serious physical harm as a result of Veronica's "history of use of illicit substances" and "recurrent close affiliation with people who abuse methamphetamines."  We reversed the court's jurisdiction findings as unsupported by substantial evidence (*In re S.S. et al.* (Jun. 23, 2021, B309447) [nonpub. opn.]), and the juvenile court later dismissed the petition.

4

The officers left the social worker with Lucy and visited the ranch, where they found Veronica and Pepe. The officers "found no concerns," but recommended to Veronica and Pepe that "the children should not be staying over due to [Pepe] living in a horse stable." The officers also reported Veronica "appeared hostile" and "refused to address the allegations." The officers told Veronica a Department social worker was at Lucy's home.

Meanwhile, the children had arrived at Lucy's house with a paternal aunt, Yvette, who told the social worker she often heard Veronica yelling at the children and calling them "shit heads," but had never seen her physically abuse them. Yvette said that Pepe lived at the ranch, which Yvette had heard was "not safe," and that he had been Veronica's boyfriend for about two months. She also said she had "heard [Veronica] has substance abuse issues," but had "never seen [her] under the influence."

Veronica now arrived at Lucy's home and spoke to the social worker outside. Veronica protested the officers' visit to the ranch and denied reports that it was "a drug house" and that she and Pepe abused the children. She said the children liked to go to the ranch to ride horses. Veronica also denied "current substance abuse." When the social worker asked her to take a drug test, Veronica declined, became upset, and soon asked to end the interview. The social worker reported that, during the interview, Veronica "appeared paranoid and would become concerned every time a car passed by or a person walking on the street passed the home" and "appeared to ramble at times . . . and at times would become hostile and then come down." At the end of the interview, the social worker made a safety plan with Veronica, which required her to ensure the children were "in safe environments." Veronica agreed to the plan and signed it.

The Department also interviewed Gilbert. He stated that he currently lives in Oregon, where he is on probation after having been incarcerated, and that he has permission to visit California for a few days each month to visit the children. He stated that Veronica's new boyfriend, Pepe, lived in a shack on the ranch, that Veronica "takes the children to stay there," that Sebastian told Gilbert that Pepe had hit him, and that Gilbert had concerns about Pepe because he heard Pepe "is gang affiliated and [a] drug user." Gilbert confirmed that he (Gilbert) and Veronica "use[d] to do drugs together," but because he lives in Oregon, he "cannot say if [she] is currently using." He added: "But she is still hanging out [with] the people we use[d] to back when I was with her, and this area is known for meth use, [and] my belief is that she is still using and probably never stopped . . . ." Gilbert also stated that, after the Department social worker's recent visit to Lucy's home, Veronica yelled that she was leaving Lucy's home and that the children would never see Gilbert or Lucy again.

Several days later, a Department social worker spoke with Veronica. She said that Matthew was with her and that Sebastian was with Gilbert. Veronica told the social worker she was currently "staying at a friend's home." When the social worker asked for that address, Veronica declined to give it.

B.     *The Department Detains the Children*

Two weeks after the Department initially investigated the referral, Sergeant Spagon and Corporal Marquez of the West Covina Police Department investigated an incident involving a car registered to Veronica. They went to Lucy's home, looking for Veronica. Lucy told them that Veronica no longer lived with her

6

and that she believed Veronica "was staying" at the ranch. She explained that she (Lucy) was raising Sebastian and that Veronica "has" Matthew. In addition, according to Sergeant Spagon's report, Lucy "expressed the fact Veronica abused alcohol and drugs."

The officers found Veronica at the ranch, where they arrested her after determining she had outstanding warrants.[4] Veronica refused to tell the officers where Matthew was, even after Sergeant Spagon explained "the importance of knowing where her[ ] child was" and expressed his concerns for Matthew's safety. Inspecting the premises, Sergeant Spagon found Matthew, who emerged from a horse stable. He also glimpsed Pepe fleeing the property on foot. Sergeant Spagon noticed clothing and other items "strewn around the horse stable as if the horse stable was being lived in." Sergeant Spagon detained Matthew and contacted the Department. In reporting the circumstances to the Department, Sergeant Spagon stated that, during his interaction with Veronica, she was "hostile" and "uncooperative" and appeared to him to be "'coming down from a high, meth.'"

A Department social worker met with Veronica at the police station after her arrest. Veronica told the social worker that she had been staying at the ranch and that Matthew slept there in the car. When the social worker asked whether she had been "staying with 'Pepe,'" Veronica would not answer. When the

---

[4]     The warrants were for leaving the scene of a vehicle accident (Veh. Code, § 20002) and resisting, delaying, or obstructing a public officer, peace officer, or emergency medical technician in the discharge of his or her duties (Pen. Code, § 148, subd. (a)(1)).

7

social worker asked her to provide Pepe's "information," Veronica refused. The social worker reported that, during this interview, Veronica was "withdrawn[,] unable to answer questions when asked[,] and putting her hands to her face and rolling her hands on her legs." That night the Department detained Sebastian and Matthew and placed them with Lucy.

C. *The Juvenile Court Sustains a Petition Under Section 300 and Removes the Children, and Veronica Appeals*

In June 2022 the Department filed a petition under section 300, subdivisions (b) and (j), alleging, among other things, Veronica's history of substance abuse put Sebastian and Matthew at substantial risk of serious physical harm. More specifically, the Department alleged that Veronica had "a history of substance abuse including methamphetamine, which renders [her] incapable of providing the children with regular care and supervision"; that the children were so young they required constant care and supervision; that Veronica's drug use interfered with her ability to provide that care and supervision; and that Gilbert knew of Veronica's substance abuse and failed to protect the children by allowing Veronica to live with and have unlimited access to them.

At the detention hearing the juvenile court found the Department had made a prima facie showing Sebastian and Matthew were persons described by section 300 and ordered their continued detention from Veronica. The court released them to their father under the supervision of the Department with a plan that placed them with Lucy.

In July 2022 the Department filed a jurisdiction and disposition report. In addition to detailing the investigation of the initial referral, the report documented that, "[p]er hospital staff, [Veronica] tested positive for methamphetamine during a pre-natal care visit at an El Monte Clinic on" September 7, 2018, i.e., while she was pregnant with Matthew.[5] The report also included statements from more recent interviews with witnesses: Sergeant Spagon stated that, based on his observations of the property, "the 'ranch' was no place for children to be" and that, on the night he arrested Veronica, "it seemed like [she] was coming down from using substances"; Gilbert stated that the ranch "area is a known drug place" and that Sebastian had demonstrated for him how Pepe "smacked" him on the head; Lucy stated that Sebastian told her he "did not like living at 'the ranch' because it is 'stinky and dirty'" and that Matthew told her he slept "on the hay" when he was with Veronica. The report described the Department's unsuccessful attempts to contact Pepe to assess the allegations concerning him, Veronica's lack of cooperation in that effort, and Veronica's failure to appear for any of the three drug tests the Department had requested and scheduled for her in the previous two weeks.

On August 5, 2022 the Department filed a last minute information report. The Department reported Veronica was not responding to its attempts to contact her by telephone and text

---

[5]    The report also indicated that from May 2013 through December 2015 Veronica was arrested six times for drug-related offenses. In one of these instances the charge was dismissed "in furtherance of justice," in another Veronica was "[d]etained only" due to "lack of sufficient evidence," and for the other instances no disposition was available.

message and, as of that date, had "not been responsive to [the Department] in regards to visitation."

On August 10, 2022 the juvenile court held a combined jurisdiction and disposition hearing. The court sustained the allegations under section 300, subdivision (b), concerning the risk of harm to the children as a result of Veronica's substance abuse, as well as Gilbert's inability to protect the children from it, and dismissed the other allegations. At disposition the court declared Sebastian and Matthew dependent children of the court, removed them from Veronica and Gilbert, and placed them with Lucy. Veronica timely appealed.

## DISCUSSION

A.    *The Juvenile Court Did Not Err in Sustaining the Petition*

1.    *Applicable Law and Standard of Review*

"The purpose of section 300 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.'" (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601; see § 300.2, subd. (a).) "Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may

10

consider past events in deciding whether a child presently needs the court's protection." (*Cole L.*, at pp. 601-602.)

Section 300, subdivision (b)(1), "allows a child to be adjudged a dependent of the juvenile court when '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of a custodian with whom the child has been left.' A jurisdiction finding under section 300, subdivision (b)(1), requires the Department to prove three elements: (1) the parent's or guardian's neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 601.)

"'"In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings . . . , we determine if substantial evidence, contradicted or uncontradicted, supports them. 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.'" [Citations.] However, "[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence

11

must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value."'" (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 602.)

> 2. *Substantial Evidence Supported the Juvenile Court's Jurisdiction Findings*

Veronica argues substantial evidence did not support the juvenile court's jurisdiction findings because "there was no evidence that [she] used drugs, was under the influence, or had a 'history of drugs'" that rendered her incapable of providing Sebastian and Matthew with regular care and supervision. She argues the court mistakenly based its jurisdiction findings "on nebulous, speculative concerns." Her argument lacks merit.

Veronica makes much of the statements by Lucy, Yvette, and Gilbert to the effect that, although they believed she abused drugs, they had not seen her do so and could not prove it. She also argues that her "being difficult" when questioned by a police officer, "withdrawn" when interviewed by a social worker, and unwilling to participate in voluntary drug-testing did not show she engaged in substance abuse. Perhaps. But that was not the extent of the evidence supporting the juvenile court's jurisdiction findings.

To begin with, there was substantial evidence Veronica had a "history of substance abuse." In addition to Gilbert's statement he and Veronica "used to do drugs together," the Department's jurisdiction and disposition report reflected that Veronica tested positive for methamphetamine in September 2018, during a prenatal visit while pregnant with Matthew. Veronica argues the latter evidence is not reasonable, credible, or of solid value because the information came from "an anonymous referral." She

12

points out the Department investigated the referral and ultimately determined intervention was not warranted when, five months after Veronica's reported positive test, she and infant Matthew tested negative for methamphetamine. But the referral was not anonymous. It came from hospital staff and concerned test results at a specific clinic on a specific date. The evidence was sufficiently sourced and definite to be of ponderable legal significance, and the juvenile court could reasonably assign it weight, regardless of what test results the Department may have obtained five months later.

There was also substantial evidence Veronica was currently abusing methamphetamine. On the night he arrested Veronica, Sergeant Spagon told a Department social worker that Veronica appeared to be coming down from a methamphetamine-induced high, an observation he confirmed in a subsequent interview. Consistent with this observation, the Department social worker, after interviewing Veronica during the initial investigation of the May 2022 referral, reported Veronica rambled, displayed fitful hostility, appeared paranoid, and became concerned every time a car or person passed Lucy's home. (See *In re Alexzander C.* (2017) 18 Cal.App.5th 438, 449 [methamphetamine is "'an inherently dangerous drug known to cause visual and auditory hallucinations, sleep deprivation, intense anger, volatile mood swings, agitation, paranoia, impulsivity, and depression'"], disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; see also *People v. Mataele* (2022) 13 Cal.5th 372, 393 [describing expert testimony "regarding the effects of methamphetamine, including paranoia, irritability, impulsivity, psychosis, and delusions resulting from sustained use"].)

Veronica argues that, contrary to a comment at the jurisdiction hearing by the juvenile court, there was no evidence Sergeant Spagon was qualified by his training to give a reliable opinion she was coming down from a methamphetamine high.[6]  It is not clear whether Veronica means by this argument to challenge the admissibility of Sergeant Spagon's statement, its evidentiary weight, or both.  But to the extent she challenges its admissibility, she forfeited the argument by failing to object or move to exclude or strike the evidence in the juvenile court.  (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1171 ["'A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless:  "There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion."'"]; *In re Michael L.* (1985) 39 Cal.3d 81, 88 ["Objections not presented to the trial court cannot be raised for the first time on appeal."]; *In re C.B.* (2010) 190 Cal.App.4th 102, 132 [parents forfeited hearsay challenge where they failed to object in compliance with Evidence Code section 353, and "'"[i]t is settled law that incompetent testimony, such as hearsay or conclusion, if received without objection takes on the attributes of competent proof when considered upon the question of sufficiency of the evidence to support a finding"'"]; see also *In re S.F.* (2023) 91 Cal.App.5th 696, 724 ["as a general rule, failure to object in the juvenile court forfeits a parent's right to pursue an issue on

---

[6]    The juvenile court stated the evidence of Veronica's "apparent substance abuse . . . included the police officer, who is trained to recognize when someone is under the influence."

14

appeal"]; *In re A.S.* (2018) 28 Cal.App.5th 131, 151 ["As a general rule, failure to object at the hearing forfeits a claim of error on appeal."].)[7]  And, of course, we may not reweigh the evidence. (*In re Caden C.* (2021) 11 Cal.5th 614, 640; *In re I.J.* (2013) 56 Cal.4th 766, 773.)

Substantial evidence thus supported the juvenile court's finding Veronica was abusing substances.  And because Sebastian and Matthew were children under the age of six, that finding created a rebuttable presumption of a substantial risk of harm to them.  (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1219 [for children "six years old or younger at the time of the jurisdiction hearing," a "finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide

---

[7]     Veronica suggests she did not forfeit a challenge to the statement's admissibility because, at the jurisdiction hearing, her counsel argued "'the [social worker's] report does not contain any details concerning the officer's training or experience.'"  But this was a passing comment by her counsel that went to the weight (or lack thereof) of what her counsel called "the strongest evidence that [Veronica] has used illicit substances."  Counsel's argument was not an objection or a request to exclude the evidence, as required to preserve the issue for review.  (See *People v. Jackson* (2016) 1 Cal.5th 269, 328 ["A proper objection must "'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling."'"]; *In re Joy M.* (2002) 99 Cal.App.4th 11, 21 [counsel's argument did not satisfy Evidence Code section 353 because it "lacked clarity and specificity" and "gave no clue" counsel wanted the evidence excluded].)

regular care resulting in a substantial risk of harm"]; *In re Drake M.* (2012) 211 Cal.App.4th 754, 767 [same]; see also *In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1385 [mother's "continuous illicit drug use" put her infant daughter "at substantial risk of harm"].) Veronica does not acknowledge this presumption, let alone attempt to rebut it. In any event, the record supports applying the presumption here: The court could reasonably infer Veronica's substance abuse contributed to the poor judgment she exercised in continuing to expose her children to Pepe, who Sebastian reported had hit him, and the ranch, which Sergeant Spagon euphemized as no place for children.

> B. *The Juvenile Court Did Not Err in Removing the Children from Veronica*

> 1. *Applicable Law and Standard of Review*

Before the juvenile court may remove a child from a parent with whom the child was residing at the time the dependency proceedings were initiated, the court must find by clear and convincing evidence that the child would be at substantial risk of physical or emotional harm if returned home and that there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c).)

"'On appeal from a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence.'" (*In re I.R.* (2021) 61 Cal.App.5th 510, 520; see *Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1005 ["when presented with a challenge to the sufficiency of the evidence

16

associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof"].)  In conducting our review, we "must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence."  (*Conservatorship of O.B.*, at pp. 1011-1012; see *I.R.*, at p. 521 ["""The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."""].)

### 2.     *Substantial Evidence Supported the Juvenile Court's Removal Order*

Veronica contends substantial evidence did not support the juvenile court's findings that Sebastian and Matthew would be at substantial risk of harm if returned home and that there were no reasonable means to protect children without removal.  But substantial evidence supported those findings by clear and convincing evidence.

There was substantial evidence that returning the children to Veronica would put them at substantial risk of harm.  As discussed, the juvenile court could reasonably conclude Veronica had substance abuse issues she was neither acknowledging nor addressing.  (See *In re D.B.* (2020) 48 Cal.App.5th 613, 622 ["Realizing conduct needs improvement is a first step to improvement.  'One cannot correct a problem one fails to acknowledge.'"]; *In re John M.* (2012) 212 Cal.App.4th 1117, 1127

[mother's failure to acknowledge her actions endangered her child supported the juvenile court's finding he could not safely remain in her custody].)  This conduct was especially dangerous to Sebastian and Matthew given their young age.  (See *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1219.)  Moreover, Veronica gave no indication she intended to stop exposing the children to the risk of harm presented by Pepe and the ranch.  (See *In re V.L.* (2020) 54 Cal.App.5th 147, 156 ["The inference from [the father's] denial is that he is less likely to change his behavior in the future."]; *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["In light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home."].)

Substantial evidence also supported the finding there were no reasonable means to protect the children without removing them from Veronica.  Protecting the children without removing them from Veronica would require her to cooperate in some measure with the Department and others helping to ensure the children's safety.  And Veronica was anything but cooperative with the Department.  She refused at one point to provide the Department the address where she was staying with Matthew, refused to say whether she had been staying with Pepe at the ranch, refused to disclose information about Pepe so that the Department could interview and assess him, and later refused to respond to the Department's multiple attempts to contact her by telephone and text message.  (See *In re E.E.* (2020) 49 Cal.App.5th 195, 212 [conduct "such as failing to cooperate with the social services agency, being less than forthcoming during interviews, or missing drug tests" can "support removal

from parental custody at disposition"].)  She also refused to disclose Matthew's location to Sergeant Spagon on the night he arrested her.

Veronica suggests reasonable alternative means of protecting the children included placing them with her in Lucy's home and ordering "unannounced visits by the Department and in-home counseling services."  But Veronica had emphatically announced her opposition to continuing to live in Lucy's home, as well as her intention to keep the children away from Lucy (and Gilbert).  And it was reasonable for the juvenile court to infer, particularly in light of Veronica's unacknowledged, unaddressed substance abuse and the children's young age, that unannounced Department visits and in-home counseling were insufficient alternative means to protect against the risk of harm.

Veronica also argues the record does not include sufficient discussion by the Department of its reasonable efforts to prevent or eliminate removal.  (See *In re Ashly F.* (2014) 225 Cal.App.4th 803, 809 ["To aid the court in determining whether 'reasonable means' exist for protecting the children, short of removing them from their home, the California Rules of Court require [the Department] to submit a social study which 'must include' among other things:  'A discussion of the reasonable efforts made to prevent or eliminate removal.'"]; Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)  The Department, however, sufficiently discussed those efforts.  The Department reported that, after investigating the May 2022 referral, it made a safety plan Veronica agreed to and, in short order, departed from by failing to ensure the children were in safe environments.  The Department attempted to contact Pepe to better assess the risk he posed to the children's safety, which Veronica succeeded in

19

preventing. The Department asked Veronica to submit to drug testing, which she declined to do. And the Department "made regular efforts to engage and contact" Veronica, which she regularly failed to respond to.

Finally, Veronica contends the juvenile court erred in failing to make a finding, as required by section 361, subdivision (e), "as to whether reasonable efforts were made to prevent or to eliminate the need for removal of" the children. She acknowledges that the court's minute orders contain findings the Department made such reasonable efforts, but argues that the hearing transcript does not reflect the court made the findings and that the transcript controls. But any error by the court in failing to make the finding required by section 361, subdivision (e), was harmless. Cases "'involving a court's obligation to make findings regarding a minor's change of custody or commitment have held the failure to do so will be deemed harmless where "it is not reasonably probable such finding, if made, would have been in favor of continued parental custody."'" (*In re L.O.* (2021) 67 Cal.App.5th 227, 247; see *In re D.P.* (2020) 44 Cal.App.5th 1058, 1068 ["Like other rulings of the trial court, when a juvenile court fails to make the factual findings required under section 361, subdivision (e), its removal order is subject to the constitutional mandate that no judgment shall be set aside 'unless, after an examination of the entire cause, including the evidence, the [appellate] court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'"].) For the reasons discussed, and given the record in this case, it is not reasonably probable that, had the court made the requisite finding, it would have found the Department could safely return Sebastian and Matthew to Veronica.

20

C. *The Department and the Juvenile Court Failed To Comply with ICWA's Inquiry Requirements*

Congress enacted ICWA in 1978 "out of concern that 'an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.' [Citation.] Congress found that many of these children were being 'placed in non-Indian foster and adoptive homes and institutions,' and that the States had contributed to the problem by 'fail[ing] to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.' [Citation.] This harmed not only Indian parents and children, but also Indian tribes. As Congress put it, 'there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children.'" (*Haaland v. Brackeen* (2023) ___ U.S. ___, ___, 143 S.Ct. 1609, 1623.) ICWA "thus aims to keep Indian children connected to Indian families." (*Id.* at p. ___; 143 S.Ct. at p. 1625.)

"ICWA and governing federal regulations (25 C.F.R. § 23.101 et seq.) set minimal procedural protections for state courts to follow before removing Indian children and placing them in foster care or adoptive homes" (*In re Rylei S.* (2022) 81 Cal.App.5th 309, 316), including asking "'each participant "at the commencement" of a child custody proceeding "whether the participant knows or has reason to know that the child is an Indian child"'" (*In re Robert F.* (2023) 90 Cal.App.5th 492, 500; see 25 C.F.R. § 23.107(a); *In re J.C.* (2022) 77 Cal.App.5th 70, 77). California law "'more broadly imposes on social services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency

21

proceeding "is or may be an Indian child."'" (*J.C.*, at p. 77; see
§ 224.2, subd. (a); *In re A.R.* (2022) 77 Cal.App.5th 197, 237.)

"[S]ection 224.2, subdivision (b), requires the child
protective agency to ask 'the child, parents, legal guardian,
Indian custodian, extended family members, others who have an
interest in the child, and the party reporting child abuse or
neglect, whether the child is, or may be, an Indian child and
where the child, the parents, or Indian custodian is domiciled.'"
(*In re J.C.*, *supra*, 77 Cal.App.5th at p. 77; see *In re H.V.* (2022)
75 Cal.App.5th 433, 437; Cal. Rules of Court, rule 5.481(a)(1).)
Although this duty is "commonly referred to as the 'initial duty of
inquiry,' it 'begins with the initial contact' (§ 224.2, subd. (a)) and
continues throughout the dependency proceedings." (*J.C.*, at
p. 77; see *Haaland v. Brackeen*, *supra*, ___ U.S. at p. ___;
143 S.Ct. at p. 1623 [when a state court adjudicates a foster care
or adoption proceeding, "ICWA governs from start to finish"]; *In
re Rylei S.*, *supra*, 81 Cal.App.5th at p. 319.) "'[T]he juvenile
court [also] "has a responsibility to ascertain that [the child
protective agency] has conducted an adequate investigation'"
[citation], and must determine whether ICWA applies to the
child's proceedings [citation]." (*In re G.H.* (2022) 84 Cal.App.5th
15, 31; see § 224.2, subd. (i)(2); *J.C.*, at p. 78; Cal. Rules of Court,
rule 5.481(b)(3).) The court may not "find that ICWA does not
apply when the absence of evidence that a child is an Indian child
results from a [child protective agency] inquiry that is not proper,
adequate, or demonstrative of due diligence." (*In re Josiah T.*
(2021) 71 Cal.App.5th 388, 408; see *In re L.S.* (2014)
230 Cal.App.4th 1183, 1198.)
Veronica contends, the Department concedes, and we agree the
Department did not comply with its duty of inquiry because it did

not ask Yvette (the paternal aunt) whether Sebastian and Matthew may be Indian children.  The juvenile court also erred in failing to ensure the Department conducted an adequate inquiry and in not making an appropriate finding, based on that inquiry, regarding whether ICWA applied.[8]  (See *In re Rylei S.*, *supra*, 81 Cal.App.5th at p. 320.)  Therefore, we direct the juvenile court to ensure the Department conducts a proper inquiry.  (See *id.*, at p. 326; *In re J.K.* (2022) 83 Cal.App.5th 498, 507.)

## DISPOSITION

The juvenile court's jurisdiction findings and disposition order are conditionally affirmed.  The juvenile court is directed to ensure the Department fully complies with the inquiry and, if necessary, notice provisions of ICWA and related California law, including inquiring about possible Indian ancestry from extended family members such as the paternal aunt Yvette.

SEGAL, J.

We concur:

PERLUSS, P. J.　　　　　　FEUER, J.

---

[8]　Indeed, as Veronica observes, at disposition the juvenile court made no ICWA findings at all.

23